# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
### SOUTHEASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 1:10CR83 SNLJ(LMB) |
| | ) | |
| MICHAEL GENE HARRIS, | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION

The defendant, Michael Gene Harris, filed his Motion to Suppress, #28, requesting that the court suppress all physical evidence seized from defendant on March 6, 2010, as well as any oral or written statements made by the defendant to law enforcement agents or before any state or federal grand jury. Both parties have filed memoranda regarding the defendant's motion to suppress. An evidentiary hearing was held before the undersigned magistrate judge on July 21, 2010, and a transcript was ordered. The parties declined to submit any further memoranda following the hearing.

## Factual Background

On March 6, 2010, Chief Deputy Richie Phillips, of the Ripley County Sheriff's Department, responded to a complaint from Paula Byerley, a resident of Doniphan, Missouri, that someone had shot her dog. Deputy Phillips interviewed Byerley at her residence and she told him that her sons saw her neighbor, Michael Harris, shoot her dog. After having Byerley and her sons fill out statements regarding the incident, Deputy Phillips went to Mr. Harris's mobile home and knocked on the front door. Mr. Harris opened the door with a quick motion, and immediately put his right arm behind his back. Deputy Phillips asked him what he had behind his back, and Mr.

Harris replied, "I have a gun," and revealed a revolver to him. Deputy Phillips instructed Mr. Harris to put the gun away, and asked him why he had answered the door with the gun. Mr. Harris replied, "I thought you were the neighbors coming over," and then turned back to the house and told the deputy, "Well, come on in." Deputy Phillips followed Mr. Harris into his home and watched him put his gun away inside his bedroom. The deputy requested that Mr. Harris step out of the bedroom to discuss the incident.

Deputy Phillips asked Mr. Harris if he had shot his neighbor's dog, and he replied, "Yes, I did shoot the dog." Mr. Harris explained that the dog had been getting into his trash and aggravating his horses. Deputy Phillips asked Mr. Harris if he would like to fill out a statement regarding the complaint, and he replied, "Yes, I do." Mr. Harris started toward his bedroom and Deputy Phillips told him that he didn't want him returning to the bedroom where his pistol was. Mr. Harris replied, "I'm not that stupid; I just need to get my glasses," and Deputy Phillips followed him into the bedroom.

After Mr. Harris found his glasses, Deputy Phillips asked him to come back out of the bedroom, and the two of them exited the room. Deputy Phillips asked defendant if he had identification, and he replied, "No, I have to get it out of my bedroom." Deputy Phillips told Mr. Harris that he could write down his information if he would give it to him, and Mr. Harris then provided his name, date of birth, and social security number. Deputy Phillips subsequently called the dispatcher at the Doniphan Police Department to check for any outstanding warrants on Mr. Harris. While Deputy Phillips was providing Mr. Harris's information to the dispatcher, Mr. Harris stated, "I am a convicted felon." Deputy Phillips asked Mr. Harris what he was doing with a firearm, and he replied, "I thought I had the right to have a gun since I was able to register to vote." Deputy Phillips asked Mr. Harris if he had been to prison, and he said, "Yes, I have."

Deputy Phillips told him that if he was a convicted felon and had been to prison, he was not supposed to be in possession of a firearm.

Deputy Phillips asked Mr. Harris if he had any other guns in his home, and he replied, "Yes, I have 4 or 5 in the bedroom," and explained that they were his wife's guns. Deputy Phillips asked Mr. Harris to show him the other guns and accompanied him into bedroom. Mr. Harris showed Deputy Phillips two guns in the corner of his bedroom and stated that there were two more beside the bed. Deputy Phillips seized the four guns that were in the bedroom and the pistol and cleared each weapon. Deputy Phillips informed Mr. Harris that he was taking the guns because Mr. Harris was not supposed to be in possession of them.

Deputy Phillips seized the following firearms from Mr. Harris's bedroom:

(a) a Marlin, .22 caliber, semi-automatic rifle, bearing serial number 14343838;

(b) a Marlin, .30-30 caliber, lever-action rifle, bearing serial number 24082783;

(c) a Henry, .22 caliber, lever-action rifle, bearing serial number 393880H;

(d) a Mossberg, 12 guage, pump-action shotgun, bearing serial number A17448; and

(e) a Heritage, .22 caliber, revolver, bearing serial number J57443.

Mr. Harris was indicted by a federal grand jury on May 20, 2010 for being a convicted felon in possession of a firearm, and the United States District Court for the Eastern District of Missouri issued a warrant for Mr. Harris's arrest. On June 7, 2010, ATF Special Agents David J. Diveley and Carlos Sampayo and Ripley County Chief Deputy Richie Phillips arrested Mr. Harris at his residence in Ripley County after Agent Diveley advised Mr. Harris that they had a warrant for his arrest. Agent Diveley advised Mr. Harris of his *Miranda* rights from a pre-printed card. Mr. Harris indicated that he understood his rights and did not have any questions. Mr. Harris was then placed in Agent Diveley's vehicle, and during the drive Agent Diveley asked defendant if he

had used the revolver that was in his hand during his previous encounter with Deputy Phillips to shoot his neighbor's dog. Mr. Harris replied, "No one's that good," and said that he used the Henry .22 rifle to shoot the dog. Agent Diveley asked Mr. Harris why he had the gun in his hand when Deputy Phillips knocked on his door in March, and Mr. Harris explained that he was not certain who was knocking on the door and held the gun for protection in case it was his neighbor.

## Discussion

Mr. Harris argues that all physical evidence and oral or written statements should be suppressed for the following reasons: (1) Deputy Phillips did not have a search warrant, probable cause, nor consent to enter defendant's home, thus his entry was unlawful and anything seized should be excluded as evidence against defendant; (2) all oral or written statements made by defendant during Phillips's visit were involuntary, elicited by coercion, and/or elicited without defendant being fully advised of and afforded his rights under the Fifth Amendment; (3) all oral or written statements by defendant after arrest were the result of an unlawful arrest and, therefore, inadmissible; and further, (4) any testimony or other evidence relating to or based upon said statements were obtained as a direct result of the violation of defendant's rights under the Fifth Amdendment; and (5) the search warrant was invalid and lacked probable cause because (a) Phillips's initial search of his residence was made without his consent; (b) Phillips's search was illegal in that it was not based upon a lawfully issued warrant or upon probable cause; and (c) any evidence obtained from his residence was obtained in violation of his due process rights and his right to be free of unreasonable searches and seizures, protected by the Fourth and Fifth Amendments of the United States Constitution.

## A. Seizure of Firearms in Plain View

Mr. Harris argues that "Deputy Phillips did not have a search warrant, nor did he have probable cause to enter the dwelling, nor was there any consent given." This statement, however, is belied by the fact that while the deputy was at the door, Mr. Harris stated, "Come on in," without any prompting from the deputy. Consent to enter the home was explicitly given by Mr. Harris, and thus probable cause and a search warrant were unnecessary for the deputy to lawfully enter the home.

Mr. Harris further argues that once inside his home, Deputy Phillips seized his guns unlawfully. This argument, too, fails. An essential predicate to a valid warrantless seizure of incriminating evidence requires that (1) the officer did not violate the Fourth Amendment in arriving at the place from which the evidence could be plainly viewed, (2) the items be in plain view, and (3) the items' incriminating character must be "immediately apparent." *Horton v. California*, 496 U.S. 128, 136, 110 S.Ct. 2301 (1990). The incriminating nature of the evidence is immediately apparent if there is "probable cause to associate the property [seized] with criminal activity." *U.S. v. Newton*, 788 F.2d 1392, 1395 (8th Cir. 1986)(quoting *Texas v. Brown*, 460 U.S. 730, 741-42, 103 S.Ct. 1535, 1543, 75 L.Ed.2d 502 (1983)).

Deputy Richie Phillips had been invited into the home after Mr. Harris had come to the door armed with a pistol. Harris had been accused of (and admitted) shooting a neighbor's dog. The deputy had reason to be and was concerned. (Tr. 14, 31). Mr. Harris told the deputy that he came to the door with the pistol because he thought the deputy was the neighbor whose dog had been killed. (Tr. 9). The deputy told Mr. Harris he needed to put the gun away and—for his own safety—followed the defendant into the bedroom while Mr. Harris put the gun away. This was a reasonable precaution for the deputy to take as he knew nothing about Mr. Harris and had never

met him before. (Tr. 25). This precaution was taken with the same concern for safety that enables law enforcement officers serving a search warrant to require persons in the home to remain in one place to preserve the status quo without arresting them. *Michigan v. Summers*, 452 U.S. 692, 705 (1981); *Illinois v. McArthur*, 531 U.S. 326, 331-333 (2001); *United States v. Wallace*, 323 F.3d 1109, 1111-1113 (8th Cir. 2003)(detention and questioning of employee during execution of search warrant reasonable because not custodial interrogation). *See also*, *United States v. Weston*, 443 F.3d 661, 667 (8th Cir.). From the testimony, it appears that the request to put the gun away, the invitation to "Come on in," Deputy Phillips's entrance behind the defendant into the house and into the bedroom (a distance of 6 or 8 feet)(Tr. 32) where he followed and watched Mr. Harris put the revolver away, were all a series of steps in the same action.

Later, when the defendant was going to write a statement, he said he needed his glasses and started toward the bedroom. (Tr. 14). The deputy's reaction was, "I told him I didn't want him going in the bedroom." When asked at the hearing why the deputy didn't want the defendant to go in the bedroom, Deputy Phillips said, "Because he had a gun in there." (Tr. 14). The deputy accompanied the defendant a second time to get his glasses. After he told Harris he did not want him going in the bedroom, Mr. Harris understood the deputy's concern (that Harris would get the pistol to use against the deputy) because he responded, "I'm not that stupid. I just want to get my glasses." (Tr. 14).

When the defendant said he had four or five more weapons, the deputy asked Harris to show him the other guns (Tr. 18), and Mr. Harris showed him two in the corner across the room and "he showed me two more beside the bed." (Tr. 19). They were plainly visible from where the deputy was standing in the bedroom. *Id*. Deputy Phillips was lawfully situated in Mr. Harris's

bedroom (in response to his request to see the weapons, to which Haris acceded) and saw the guns in plain view, therefore the seizure of the guns was lawful and they should not be excluded from evidence.

Even had Deputy Phillips not been justified in accompanying Mr. Harris into the bedroom to make sure he put the pistol away and a second time to make sure Harris retrieved his glasses and not the pistol, the deputy did not seize the weapons until after he learned that Harris was a convicted felon and after he had been taken to the bedroom a third time in response to the deputy's request to see the additional weapons. (Tr. 18-19).

## B. Non-Custodial Statements Made by Harris to Deputy Phillips at Harris's Residence

Mr. Harris argues that all oral or written statements made by defendant during Phillips's visit on March 6, 2010, were involuntary, elicited by coercion, and/or elicited without Harris being fully advised of and afforded his rights under the Fifth Amendment. The facts do not suggest that Mr. Harris's statements during Phillips's visit were anything but voluntary, however, and there is nothing to suggest that a *Miranda* warning was necessary. *Miranda* warnings must be given only when a suspect is <u>both</u> in custody and about to be subjected to government interrogation. *See Illinois v. Perkins*, 496 U.S. 292, 297 (1990). A suspect is in custody if, considering the totality of the circumstances, a reasonable person would not feel free to end the encounter and leave. *See Yarborough v. Alvarado*, 541 U.S. 652, 663-65 (2004); *see also U.S. v. Lawson*, 563 F.3d 750, 753 (8th Cir. 2009)(no custody because agent advised defendant that he did not have to answer questions and that he was not going to be arrested, defendant was not restrained, interview lasted 1 hour, defendant was interviewed in his own home, and defendant was not arrested at conclusion of interview).

In the case at hand, and much like in *Lawson*, Mr. Harris was interviewed in his own home, was not restrained, had explained to him a number of times that the deputy was not arresting him (Tr. 24, 34), and was not arrested at the conclusion of the interview. Defendant's freedom to move about was unrestricted, and although Deputy Phillips informed Mr. Harris that he had reservations about Harris's return to the bedroom, the deputy never made any attempt to impede his movement. Considering the totality of the circumstances, Mr. Harris was never in custody and could have ended the interview at anytime, including the moment when he opened his front door. A recitation of defendant's *Miranda* rights was not required, and thus his statements should not be excluded.

## C. Post-Arrest Statements Made by Harris to Agent Diveley

Mr. Harris next argues that all oral or written statements made after his arrest should be excluded because they were elicited without Harris being fully advised of and afforded his *Miranda* rights. For Mr. Harris's incriminating statements to be admissible, he must have voluntarily, knowingly, and intelligently waived his *Miranda* rights. *See Miranda v. Arizona*, 384 U.S. 436, 475 (1966). Although Mr. Harris argues that he was not advised of his right to remain silent, the testimony from the evidentiary hearing affirms that Harris was fully apprised of his *Miranda* rights.

After Mr. Harris's arrest, Agent Diveley's recited the *Miranda* rights from a pre-printed card and asked if Harris had any questions. (Tr. 40-41). Mr. Harris indicated that he understood his rights and did not have any questions. During Mr. Harris's transportation to Cape Girardeau, he made a number of responses during interrogation, but never once invoked his *Miranda* rights or otherwise refused to answer Agent Diveley's questions. (Tr. 42). There are no facts to suggest

that Mr. Harris did not knowingly waive his *Miranda* rights after his arrest, and thus his statements are admissible.

## RECOMMENDATION

**IT IS HEREBY RECOMMENDED** that Defendant's Motion to Suppress Evidence (Document #28) be denied.

The parties are advised that they have fourteen (14) days in which to file written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in a waiver of the right to appeal questions of fact. *See Thompson v. Nix*, 897 F.2d 356 (8th Cir. 1990).

Dated this 27th day of September, 2010.

_____
LEWIS M. BLANTON
UNITED STATES MAGISTRATE JUDGE